Case No. 14-1391. We are aware that there's also a pending motion in relation to this case, and we will deal with the two matters collectively. We don't believe we need argument on the motion to dissolve the injunction. That's well-briefed, and we don't need you all to waste your argument on that issue. So let's stick to the merits of the appeal. All right. Mr. Brown, I understand you want three minutes for rebuttal? That's correct, Your Honor. Okay. All right, you may begin. Good morning, Your Honors. I'd like to start by focusing on the fundamental legal errors, distinct from the fact errors, in the district court's decision that we've asserted on appeal. The first one is the court's motivation analysis, which we believe ignored important claim limitations and is a very general motivation analysis that does not deal with the specific claim limitations directed to solving the food effect problem that the court found the patentees here discovered. The second is that the court applied the incorrect legal standard for the claim, and the district court never found that the prior art necessarily and inevitably resulted in the claim limitations that the court labeled inherent here. We think the court did a different analysis. And we believe these legal errors on their own require reversal, and in addition, at the end, we'll deal with some of the clearer factual arguments that we have. But I'd like to give a brief background to explain why the court's decision is hindsight-driven and why these legal conclusions resulted in the wrong outcome here. I don't think we need too much of a background. We're all familiar with the facts. Understood. So we do think it's important, particularly in relation to the Leo case, which we think is very similar to the facts here, that nanotechnology, the principal references, that the court relied on, came out in the early 90s, 93, 94, 95. Megis OS, the original product, came out in 1993. There were several other companies who worked directly on the gestural suspensions, particularly Parr, Boringer, Engelheim, and the Ragunathan and the Brubaker references. Is it really primarily one of your arguments that nanotechnology wasn't developed enough to provide a reasonable expectation of success, or are you really focusing more on the question of whether the motivation has to be tied to every limitation? We're focusing on the legal requirement that the motivation has to be tied to every limitation, and if not, if there is a role for inherency in this kind of analysis, it requires that, since you don't have a motivation, the prior art inevitably take you to the end. And we think the courts... Yeah, but there's two different questions, as you said, whether or not there was a motivation, and then your inherency argument. So I'm sticking with your motivation argument first. Yes. Is your argument that nanotechnology wasn't fully developed, you made that argument a little bit in your blue brief, but in the reply you focused more on the question of whether the motivation, whether you could have an alternative motivation for purposes of having a motivation to combine? Correct. We think the fact that nanotechnology was not fully developed is a factor going into the motivation analysis. The court never did the objective inquiry, once the court identified her alternative motivation. She never did the objective inquiry of a skilled artisan sitting in 2002 looking to address the court's motivations of viscosity and How do you get around the fact that your own written description describes those factors as things that you want to fix? I think in particular, I think that identifying something as a problem, and this is onto the clear error section, but identifying something as a problem is a subjective designation. And so the fact that people knew they were giving something that's probably like Pepto-Bismol, it's thick, they knew they were giving that, but nobody in one piece of paper from 1993 to 2002 had ever identified it as a problem, had ever identified it as something that needed fixing. And so that's why we contend it's a clear error. And the statements in the specification are acknowledging what the product was, but nobody had labeled that as a problem until we came up with a better solution. Okay, so your argument is simply that because you identified another problem in addition to others that you identified, that all the problems had to be tied to the motivation to combine? That the motivation to combine has to be tied to the claims. It's not just that we discovered the problem, it's that we claimed the problem. I think the Allergan B. Sandoz case is a good example of this. When you're referencing the problem, are you talking about the food effect? It's the food effect and the fact that the drug was not the food effect is that people who were anorexic and weren't eating, weren't absorbing the drug, then when they would start to eat, then they would start to absorb the drug. Nobody knew that they weren't absorbing it and nobody knew about... You wrote that limitation into your claim. Correct. I'm looking at, I guess, Representative Claim 1, and it has that as Part C. Yes. Hypothetically, if you hadn't put Part C in, and all you had is A and B about the dosages and the size of the particles, would that be obvious, just with A and B, with the dosage and the size? We don't believe it would be obvious, but that would be a very different obviousness argument. Because there, you know, the drug obviously is known. Correct. And using nanotechnology to make it smaller, I assume that's where your argument would be, but it seems like you'd have an uphill battle on that. So the question for us then is whether C is actually a limitation or is just an inherent description of the properties of A and B. Is that right? I think there's two questions layered in there. The first is, is it a substantive limitation? Does it differentiate and narrow the claim? And the District Court, under claim construction analysis, found that it was a substantive limitation. It did narrow the claim. I think the prosecution history clearly supports that. We added that to narrow it to only specify those formulations that resulted in the elimination of the food effect. I'm very cautious about the use of the word inherency there, because we think the fundamental error that the court did, and this is reflected in TWI's briefing as well, is the inherency doctrine requires that the prior art make the limitation necessarily present and inevitably present. In TWI's analysis, and we believe implicitly in the District Court's analysis, she started with the claim. She started with the claim and said, does part of the claim render other parts of the claim inherent? And then, not only that, she didn't apply the necessarily present standard. She applied a, if something within there, I think she took the language from the Santoros case farther than it will stretch, and that if anything within this general motivation, maybe the millions of possible permutations, she called it limitless in her summary judgment order, or an unlimited array of possible combinations. If anything in there results in these properties, I'm going to label those properties inherent, because they're a property of the thing that has them. That's completely circular reasoning and avoids the question. Was there expert testimony on inherency? There was. We don't believe there was. Their expert used the word necessarily one time in the entire transcript, never used the word inherent. Our experts didn't testify about it. They put on an ablement case. They tried to argue that you only get the claimed elimination of food effect under very certain specific conditions. You don't get it everywhere. And we didn't dispute the fact that you only get it in certain situations. We said our specification gives you enough guidance to figure out where those are without undue experimentation. But nobody at trial said if I do A, B, C, D, and E, I necessarily get these food effect limitations. In fact, in some of the claims, particularly the ones with the 700 nanogram per milliliter C-max limitation, that excludes some of our preferred embodiments. That can't be inherent. How do you prove inherency across a range? I think it's very difficult. Inherency arose as a doctrine in the anticipation context where you had a specific thing. That specific thing has specific properties. As soon as you start to have, even in the anticipation context, as soon as you start to have design choices within the reference, I could pick A, B, C, or D, then the cases say, well, it's not a matter of probabilities. It has to inevitably be there. When you multiply that by obviousness, you're combining two generalized subject matters with all the possible design choices, all the possible different things that a formulator could do. I think the inherency doctrine only applies in rare circumstances. For example, the in-ray cow decision, I think, is a good example of when it does apply. The court found that the drug there, oxy, I think it's hydromorphone, had a food effect. It had it in, no matter what you did to it, it had it in immediate release, it had it in sustained release, and the patentees discovered that, and they just stuck that on the claim limitation. That would be like if we took megase OS and added a food effect limitation that says it has a food effect and tried to claim that, but we can't do that. That's when inherency applies. Was there, is there anything in the prior art where it says that nanotechnology will have a, will reduce the food effect across all drug formulations? No, there's not. There, in Alon's marketing materials, there were representative ideas about what this, what this is useful for. They mentioned reduction in food effect. Alon had published data for three different drugs with respect to food effect and nanosizing. Two of them had a positive effect. One of those two was an unknown drug. The other one the district court specifically found was not a good model for magistral acetate. And then the third drug, it had no effect on, on, on food effect. And so, and I take it then that there's nothing in the prior art where they said there would be a substantial reduction in food effect across all drug formulations. That, that, that's absolutely correct. And that's in fact not the case. It can increase the food effect, it can do all kinds of things. I think the FDA guidance that appears at A6024 to 35, that document, which is contemporaneous, it's not dealing with nanotechnology, but it goes into detail in explaining that food effects based on formulation changes are highly unpredictable. And we think that... Can, can I ask you another hypothetical? And I know this isn't even remotely the facts, but assume that we think A and B, combining them, are obvious. And that, that somebody comes in with evidence showing that across the entire ranges here, it's going to have the food effect you described in, in limitation C. Yeah. Does that render C not really a limitation anymore, just a description, and therefore inherent? Yes. And I understand there's, at least from what I can tell, there's no, nothing even close to suggest that, that combining A and B will give you the food limitation C across the range. I think if, if a claim, if a hypothetical claim has three limitations and a fourth that there's no difference in scope by adding the fourth, you can conclude that that's not a material limitation. But I think there's a difference, though, in the obviousness analysis because the first part of the question was, if we conclude that A, B, and C are obvious, I think, I think there's a problem with that formulation because the claim needs to be assessed as a whole in the first instance. And so the obviousness analysis with unexpected results and secondary considerations and everything needs to face the claim as a whole. I think there's a lot of danger in breaking up the claim into parts and saying, well, this part would have been obvious, but it may have been one of a lot of sort of obvious avenues. And would you be really motivated to do that in view of unexpected results, in view of secondary considerations? Let me ask you to clean something up for me. You asserted at page 12 of the blue brief that in Graham, the second group of patients had more rapid absorption but gained no weight. Yes. TWI says that that's not true, that in fact two of the four patients did gain weight. I want you to resolve that inconsistency for me. Certainly. We were relying on Graham's conclusion, I think it's in page 585 of her document, where she groups the patients and takes the average outcome, which is a negative .2, and within that there's variation. That's another part of Graham's teaching was we had a lot of variation. But Graham, who's one of the top experts in the field, looked at all these patients and said, I'm going to group them into two groups. One has fast absorption, they get a bad outcome. The other one has slow sustained absorption, they have a good outcome. You explain it. I looked at it and thought, well, wait, because the numbers were correct. Okay. Thank you. You're into your rebuttal time. We'll give you the full three minutes, and so we'll give  it to Don Mazurk. May it please the court, my name is Don Mazurk, I represent PWI Pharmaceuticals. I first want to thank the court for scheduling this oral argument on an expedited basis, given the situation with respect to the marketing of the product. I guess I can respond to some of the questions that were asked by the court, and as far as your hypothetical of the A and the B, and then the C, well, I think the facts are, is that without the C, certainly the patent office, and even there were some continuation applications with respect to efforts to try to prosecute the claims without the C, and those went up to the PTAB, and those came back as obvious. They appealed them, and the panel said those claims are obvious, so I think you can kind of, your hypothetical is correct, that the formulation elements of the claim are obvious, and I think there's a little bit of... Right, but they don't dispute that. I mean, their argument is that these limitations that they put in to overcome those rejections render it non-obvious. Well, yes, on the particular food effect, and let me talk about the range, the issue here. There's a little, the range that they're talking about is the range in particle size claimed in the patent. They claim zero to 2,000, which is actually zero to 2,200 nanometers. The prior art, the Liversidge patents, said for magistral acetate specifically, there were claims in the 215 patent that said you want to formulate magistral acetate with particle size of less than 300 nanometers. That's the prior art, less than 300 nanometers, and there was evidence at the trial court that, and the district court clearly found this, she made a number of findings about this property when she got into what causes the improved food effect, the improvements that the Liversidge patents brought to light, that when you have the particle size this small, Dr. Beach called it a sweet spot, that you get these very dramatic improvements in this sweet spot. That is the prior art. Is there anything in the prior art that says that across an entire range, there will always be a food effect, an improvement of a food effect to a substantial degree? I would say yes. When the patentee, Dr. Liversidge and the patentees of the 684 and the 363 patent and the 215 patent went to the patent office for those patents, they were rejected, and they responded to the patent office by telling them that the unexpected properties of the prior art patents were that you would get these improved properties, including food effect. Yeah, but the food effect references are sort of just never very specific. They said greater bioavailability. That doesn't necessarily mean a food effect. Well, what it means is that if there is a food effect in the product due to the particle size, it will be solved. It will be reduced. Solved? Well, it means if you don't have a food effect to begin with, I think that's a little bit of their problem with respect to the unexpected result. It was not unexpected that when you did nanosize the product, that you would reduce the food effect, that you would have a formulation with a reduced or absent food effect. What the issue was is when you start out before the old prior art, how big of a problem, how big of a gap do you start with, but there was no surprise that the prior art, that the nanosizing it will eliminate it if it exists. There were no examples. Well, you say that, but I mean, the limitation, if we take it as a limitation in C is very specific. It's not that it helps with the food effect or that it decreases the food effect. It's that there's no substantial difference in the Cmax versus a fed versus a fasted safe. Is there anything in the prior art that says that nanosizing is going to get you this? It seems to me that you're saying the prior art said that nanosizing made it better, but not this limitation. Well, Your Honor, the district court, we had a claim construction debate about what was meant by no substantial difference meant they were the same, that there was no substantial difference like FDA bioequivalency standards. PAR, the plaintiffs, opposed that claim construction and said no, no substantial difference means, and I think the summary judgment opinion has the claim construction, basically means better than the prior art. And so, actually the 60%, I think that people have been focusing on the 60% one, is really the narrowest limitation in any of the claims regarding food effect. 60%. That's the one claim that claims in the Marpouche group down to 60%. So, I think on the court's construction, no substantial difference allows for a much higher food effect than 60%. I don't understand exactly how you're, first of all, you argued inherency in relation to anticipation below, correct? We argued yes. And with respect to the obviousness, your inherency arguments were really not the focus of your obviousness analysis. No, they were the focus of our obviousness. We did make the same arguments with respect to this claim limitation. We said that the reduction in the food effect, this broad reduction, because it's the lowest it gets at 60, so saying that you're going to improve the food effect, I think 60% is pretty much what you get. And the evidence is that when you reduce the particle, the only, there's not a lot of limitations, there's not a lot of variations that are in the patent. The only way the patent describes, the only method of getting the improved food effect, it's in the patent, is a reduction in the particle size. That's it. There is nothing else in the patent about that. And all the examples in the patent are with particle sizes of less than 300 nanometers. This was the sweet spot. But that's your enablement argument. I mean, you say that these limitations are not enabled. That's a little inconsistent with saying that everybody knows they're going to happen. Oh, no, Your Honor, not at all. What we're arguing is that by claiming broader than the prior art, they don't make the invention non-obvious. The obvious formulation, the substitution of the nanoparticles that are in the prior art, in the MEGACE OS product, in the prior art product, switching the micronized particles with the prior art magestral nanoparticles, and these are the particles in the prior art for magestral acetate, less than 300 nanometers, produce invariably, necessarily, better improvements than well below 60 percent, depending upon what's the dose. Since they claim broader than 300 nanometers, they're not making it non-obvious. Since they claim the obvious formulation, 300 nanometers, what the prior art says to do with magestral acetate, they don't make it non-obvious by saying, we want to claim not just 300, but up to 2,000. So that's where the arguments are completely consistent and you can't... Did you provide expert testimony that's saying that the food effect to these degrees would always be present? With respect to, Dr. Beach said it was the sweet spot, yes, we did. Dr. Beach said that, Judge Blake cites it in her opinion. I believe she states that... She states that Dr. Beach testified that the improvement in bioavailability necessarily results in the reduction in the food effect, whether known or not. It's at 827 of her opinion. And that's the whole point, is that interpatient variability, as the court said, the problems known to exist with MEGACE-OS were its viscosity, its dose value, its varied efficacy in patients, and that each was known to be affected by the drug's particle size. Our expert testimony said that the problems of interpatient variability, food effect, and bioavailability are all, they're a package deal. You improve one, you improve them all, because they're all caused by the particle size and the physical, the laws of nature regarding solubility of these drugs when they're poorly soluble. And that's, so the prior, when they went ahead and performed... How do you distinguish this case from Allergan? From the Allergan case? Well, in the Allergan case, inherently wasn't argued. I think that's what the court observed. You know, the facts are pretty similar to the facts here, and we found that it wasn't inherent there. Well, in that case, the issue was when they reduced the dosing from 3 to 2, they claimed, in the one claim, they claimed without a loss of efficacy. That's different than the loss of efficacy was there was nothing in the prior art to say that that was an expected expectation when you would make that kind of change. Here, we have the exact opposite. We have the prior art that says when you reduce the particle size to this level, you can expect that you will reduce or remove any food effect. So, no, there's nothing in the prior art. This is what it comes down to. You say that, but when I read the expert testimony that the district court looked at, it doesn't seem to say that precisely, or at least in the way that this claim limitation is written. It says it increases bioavailability. If that's all this limitation in Claims Part C said, then I think you'd have a much stronger case. But this limitation is very specific. Well, the point is that the patent says, and the patent even says this, you are going to get, well, first of all, the only trick in the patent is reduction of the particle size, and the patent itself says that the smaller the particle size that you use, the more likely you are to get the claimed benefits. And so here, the prior art says use the smallest particle size. That's the smallest particle size that anyone can make, is the two to three hundred nanometer particle size. They can't even make it smaller than that. So they claim zero to two thousand, but the prior art says use two hundred to three hundred, which is the optimal particle size, and it's the particle size that produces the claimed benefits. But the benefits that are described for the nanocrystal technology are generalized. The problem is if one of the benefits was it will make something warmer, does that mean that if there's a claim that it's, you know, to four hundred and twenty degrees, that it's always inherently going to be four hundred and twenty degrees just because it might make it warmer? Well, in this case, when the properties, it's a matter of science that you'll have the improved element, yeah, yeah. To what degree, though? That's the problem with the inherency element. To the degree you get. To any degree? No, that's the whole point with the inherency issue, is that the solubility of the product is a physical property of the particle size. It sounds to me that you're arguing that subpart C isn't really a limitation at all. No, I think part C is, I think in practicality, it is a limitation, but the problem with it is that they only enabled how you get that as part C with particles less than three hundred nanometers. You can't get that with particles greater than three hundred nanometers. Well, I understand you have an enablement argument, but for purposes of inherency, if it's a limitation, then it seems like it has to be a limit. For it to be obvious, it has to be a limitation that is present in the prior art. In the degree, it says here, and I'm just still struggling with the notion that the evidence you cite me from the district court citing the expert testimony just talks about an improvement in bioavailability. It doesn't come close to no substantial difference in the Cmax. Well, I think, I'll answer it two ways. It's just a result of measuring what you get when you follow the prior art. If the claim limitation was, part A was, particle size less than three hundred nanometers, then I would say, yes, you get that reduction claimed every single time. It's necessary. You cannot get around it. It's there. It's part of it. It is that. Now, I don't think, with all due respect, with respect to obviousness, because they broaden that to being two thousand, they don't make it not obvious. If we disagree with the district court's inherency analysis and the application of inherency in the obviousness context in this way, then what do we do? If you disagree, well, because I think the court did two different things. The court found factually that when you reduce particle size this small and you measure the result, you get this as a factual matter. And the court… Well, she didn't. And she also… She didn't really. That's part of the problem. For factual findings, even if we agree with the factual findings, she said you'll have some reduction in food effects. She never tied the two together. So do we send it back for more findings as it relates to inherency, or do we send it back for her to consider your enablement argument, or what do we do? Well, I think if it's a factual finding that is necessary that we don't have, I think you have to remand it for a factual finding if she got the law wrong on inherency, so that she can apply the correct legal standard to the facts and see what the result is in terms of a factual finding. As far as if you reverse it, you also have to… If you do overrule her obviousness finding, she didn't complete the analysis on the other invalidity defenses, and so it would have to be remanded to the district court for addressing those defenses. So it's your position that if what we're uncomfortable with is the absence of fact-finding that would allow this type of inherency analysis in an obviousness context, we should, instead of reverse, vacate and remand for additional fact-finding? I think yes, because the issue you're describing is a description of what the court made a legal question and needs to make factual findings that would apply the correct law to the facts. And if she couldn't make those findings on the record presented, then… Then I guess it would be at her discretion on how she handles that particular issue. If she felt the law was different, she'd have to handle the matter in the way she saw it would be… But there are other invalidity arguments that were raised that the court never addressed. Yes. Okay. But I think the question on the inherency issue, this is more like… I think this is more like the other inherency cases that we cited where clearly we have the Liversidge patents which explicitly list magistral acetate as a drug to be nanotized. And then they say, and they prefer 300 nanometers as the particles, less than 300 nanometers as the particle size. And they say that when you complete the nanotizing process as discussed in the Liversidge patents, you get a suspension of the drug particles in a solution. You get them in a liquid. That's what you end up with. And then the patents, the Liversidge patents, says that a person of skill in the art could easily deploy those into a dosage form. A person of skill in the art could do that. And then they said a person of skill in the art could easily determine, readily determine is what the patent prior says, what amount to give anybody of that. That's what the prior art says. Any last thoughts? Thank you. We've just got to keep it even here. I'm sorry. Any last thoughts? No, Your Honor. We appreciate it and thank you very much. And we believe the district court's decision should be affirmed. Okay. Thank you. Thank you, Your Honor. In response to a part of the discussion that just occurred, I do want to emphasize there was no testimony, nor was there any finding that anything in particular, every single time resulted in any of the food effect limitations. All of the technology – Your friend referenced the claim construction that construed Part C. Could you address that? Yes. I think he just had it backwards. He said that the claim construction was, I think the word he used was better than the prior art. The claim construction that we asserted, and I don't remember the exact terminology that she adopted, but it was basically commensurate with the inventive examples that we showed in the specification and prosecution history, such that the product could be taken without regard to meals. There was something to that effect. There was a clinical component to it. But it was commensurate with what we disclosed, not better than the prior art, because there's a big gap. The prior art, as we discovered, had somewhere between a 630 and 780 percent food effect. We're claiming less than 100, less than 60, no substantial difference. How do you respond to his argument, though, that he said that if clearly a portion of your range, by definition, would be inherent, and that you can't just broaden the range and then argue that there's no inherency? I think then, well, first of all, that opens up a very different obviousness argument that they didn't make and that wasn't part of the trial, because then you have more components that you have to combine in a certain specific way. The district court didn't find that there was a particular prior, that the prior art would have suggested a particular narrower range that you would have necessarily done when trying to solve a viscosity problem or trying to solve an interpatient variability problem. She just didn't go down that path. Second, we think that the testimony at trial is just inconsistent with the idea that particle size alone is everything. I mean, their own expert in his cross-examination testimony at A3128 for 3129, and you can see it in column 33 of the patent. There's a lot of other work that has to go into this besides just make the particles a certain size. You have to optimize the surface stabilizers. You have to do a lot of other things. So the idea that it is inherent in anything, I don't think there's record support for it. They didn't put it on. Do you agree that the most we could do would be to vacate and remand for the district court to look at this again? I think for the issues that the district court did not address, I think that goes back to the district court. I think for the obviousness discussion, the complete absence of a record on inherency, I think is sufficient for this court to rule. In addition, the other grounds that we've asserted, particularly I think the Graham argument on teaching away, I think is really compelling, and that provides I think that and the unexpected results analysis. Are we just wasting everybody's time if we send it back and you've got an enablement problem? No, I don't believe we do have an enablement problem. We put on extensive expert testimony that we don't have an enablement problem, and that's a fact question. Anything else? Thank you. Thank you. All rise.